Filed 9/21/16  P. v. Cornelius CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>TOMMY BERNARDO CORNELIUS, JR., et al.,<br><br>      Defendants and Appellants. | C073004<br><br>(Super. Ct. Nos. 08F09791,<br>    05F03667, 08F09027) |

On Halloween night 2008, a man (the victim) was at a Shell station across from Arden Fair Mall to pump gas when one of the defendants here, George Christian, asked where he was from.  The victim answered, " 'San Francisco.' "  This set off a group beating of the victim by Christian and others in the Killa Mobb street gang that ended up with the victim severely injured.

1

One jury found Christian guilty of attempted murder, mayhem, assault with a firearm, and grand theft from a person, a lesser included offense to the charged robbery. A second jury found defendant Samuel Kemokai guilty of the same crimes. A third jury found defendant Tommy Cornelius guilty of attempted murder, assault with a firearm, and grand theft from a person, a lesser included offense to the charged robbery. And a fourth jury found defendant Xavier Whitfield guilty of assault with a firearm. The juries also found true gang enhancements and firearm enhancements for these defendants.

The trial court sentenced Christian and Kemokai to 30 years each in prison, Cornelius to 20 years, and Whitfield to 15 years.

On appeal from the resulting convictions, defendants raise various contentions relating to bifurcation of the gang enhancement, the gang expert testimony and other evidence and instructions relating to the gang enhancement, admission of photographic and bullet evidence, accomplice testimony, sufficiency of evidence supporting the attempted murder convictions, cumulative prejudice, juror misconduct, and sentencing. We reject these contentions except the last one, as we modify Cornelius's sentence to strike a 10-year firearm use enhancement.

FACTUAL AND PROCEDURAL BACKGROUND

A

*Charged Offenses*

The victim and his friends were at the Shell station to pump gas after attending a local party. At the gas station, one of the victim's friends saw a black Dodge Charger and a green Ford Taurus. Associated with the black Dodge Charger were two men -- Christian (wearing an orange shirt and white and orange hat) and Whitfield (wearing a purple shirt with no other shirt underneath the purple one). Both men had guns, one of which looked like a ".380." Christian had a verbal altercation with the man sitting in the green Taurus and then chased off the Taurus while waving a gun. One of the victim's friends heard Christian and Whitfield saying, " 'We Killas out here.' "

2

After the altercation between Christian and the occupant of the Taurus, the victim (who had just finished paying for his gasoline), was walking back to his own car and was approached by Christian. Christian asked where the victim was from, and the victim responded, " 'San Francisco.' " Christian then said "his gang['s] name," which was two syllables,[1] and hit the victim "pretty hard" in the head, knocking him temporarily unconscious.

Within seconds, a group of people surrounded the victim and were attacking "like a pack" of "hyenas on him." The attackers included Christian, Kemokai, Whitfield, Cornelius, Demetrius Royster, Drew Dotson,[2] and Ravneel Atwaal, the latter who was granted use immunity for his trial testimony. Atwaal was portrayed at trial by the defense as a rich boy who lived in a nice suburban neighborhood and drove a Lexus. Another Killa Mobb member, Richard Lee, also was in the group who surrounded the victim and had a gun. Atwaal did not see Lee beat the victim or use the gun on the victim, although one Rafael Simpson saw Lee beating the victim with Lee's own gun.[3]

---

[1]    A friend of the victim, who was at the beating, recalled someone yelling out "Killa Mobb" that night.

[2]    Royster and Dotson were charged with crimes relating to the beating of the victim but neither of them are parties to this appeal.

[3]    Simpson had been a member of Killa Mobb and was with the attackers at the Shell gas station. He denied hitting or kicking anybody that night. He saw Christian start the fight by pistol whipping the victim in his face. When shown a video of the beating at trial, Simpson identified Cornelius as the man with the purple short-sleeved shirt over a long-sleeved white shirt. The man wearing that clothing can be seen on the video kicking the victim in the head. Simpson had been jumped out of Killa Mobb at the time of the Shell gas station beating. He left Killa Mobb because the gang was "[a]lways fighting" and that lifestyle "wasn't for [him]."

Part of the group beating that was captured on video was played at trial. Atwaal also testified to what he saw on the video. At one point in the beating, Christian was outside the circle of attackers, but then he worked his way back in by shoving others out of the way. Christian lifted his arm over his head and swung downward toward the victim. The victim tried to roll away from the attack, but Christian and Kemokai pursued him. Christian slipped on the wet concrete but got back up and kicked the victim in the head. After Whitfield repeatedly stomped on the victim and walked away, Kemokai hit the victim in the upper body/head area with two overhead, heavy blows. Kemokai, Christian, and Cornelius searched the victim. Christian pistol whipped the victim in the head. Christian fled, leaving Cornelius and Kemokai with the victim.[4] Cornelius kicked the victim's head and walked away, while Kemokai stood motionless over the victim. Kemokai pulled out a firearm from his waistband or pants, raised the firearm over his head, and delivered one blow to the victim's head with the firearm. The victim's body jerked upward.

As a result of the beating, the victim had multiple lacerations to his head and face, a fracture to the upper jaw, and was at risk of a concussion and serious neck injury.

Before the attack, the victim had on him his cell phone, a wallet, and a digital camera. After the attack, he was missing his cell phone and camera.

B

*Investigation Of The Shell Gas Station Beating*

Metro PCS cell phone records were recovered from some Killa Mobb members involved in the beating. Some text messages sent after the beating stated things like " 'we shot up that shit, killa,' " "[t]hey got five people now," "[s]top texting mother fuckers. Stay focused."

---

[4]    Christian's hat came off during the beating, and Simpson picked it up.

Eleven days after the beating, police found Lee driving a car, and Lee correctly told police that they would find his .380-caliber gun in the pouch behind the front passenger seat. The gun was loaded and included one CCI brand round. Police went to Whitfield's house to conduct a search because police had overheard Whitfield telling another suspect in a police interview room that they had hidden something in Whitfield's couch. That something turned out to be nine .380-caliber live ammunition rounds, including four rounds of the CCI brand.

## C

### *Gang Evidence*

Sacramento Police Department Detective Brian Bell was the lead investigator and was also the People's expert on street gangs in Sacramento's north area. Killa Mobb's primary activities included "burglaries, robberies, shootings, [and] unlawful gun possession." He based this opinion on his eight and one-half years as a police officer, two and one-half years as a gang detective, being the lead investigator in this case, being the lead investigator on at least 30 other gang crimes, and assisting on 60 other gang crime investigations, reviewing police data bases "for informational purposes to gather . . . information about Killa Mobb," being in daily contact with gang members, including at least 15 members of Killa Mobb that included "conversations" with Killa Mobb members and associates about that gang's "culture and crimes," and viewing MySpace pages that included photographs of gang members with messages stating what gang a certain person was in. Some of these MySpace pages included photographs of Lee, Whitfield, Christian, Dotson, Cornelius, and Royster.

According to certified documents, Killa Mobb member minor J. D. was charged with burglary in December 2006 and admitted to battery in January 2007, "a reasonably related offense" to the burglary. According to other certified documents, minor C. B. admitted in November 2007 to possession of a concealable firearm by a minor. One of his conditions of probation was not to knowingly associate with gangs and to tell the

5

probation officer of his street moniker. During a conversation, C. B. told Detective Bell he was a member of Killa Mobb at the time of this crime.

The parties stipulated that Lee had been convicted of "assault with a firearm" that occurred during the second half of 2008 and he admitted that crime was committed for the benefit of or in association with Killa Mobb.

In mid-October 2008, Atwaal and other Killa Mobb members shot at an occupied car at an am/pm market in an incident in which Killa Mobb members were the aggressors.

DISCUSSION

I

*The Trial Court Acted Within Its Discretion When It*

*Denied Defendants' Motion To Bifurcate The Gang Enhancements*

Defendants Christian, Kemokai, and Whitfield contend the trial court erred in denying their motion to bifurcate the gang enhancements from the trial on the substantive offenses. The trial court denied the motion because "the entire motivation for the assaults . . . in this case [is] gang related. It seems almost impossible to therefore sever the gang allegations and to try the particular case without at least the cross-admissibility of the . . . gang allegations." The court acted well within its discretion in denying the motion based on the facts available to the court at the time the motion to bifurcate was denied. (*People v. Hernandez* (2004) 33 Cal.4th 1040, 1048 [standard of review]; *People v. Avila* (2006) 38 Cal.4th 491, 575 [a court reviews the motion based on the facts as they appeared at the time the court ruled on the motion].) We explain.

"[T]he criminal street gang enhancement is attached to the charged offense and is, by definition, inextricably intertwined with that offense. So less need for bifurcation generally exists with the gang enhancement than with a prior conviction allegation." (*People v. Hernandez, supra*, 33 Cal.4th at p. 1048.) Moreover, gang evidence is often relevant to "identity, motive, modus operandi, specific intent, means of applying force or

6

fear, or other issues pertinent to guilt of the charged crime." (*Id*. at p. 1049.) When this is the case, a defendant seeking bifurcation bears the burden " 'to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.' " (*Id*. at p. 1051.)

Here, when the court denied bifurcation, the court had strong evidence before it that the motive for the beating was gang related. At the preliminary hearing, Detective Bell testified that prior to the beating, one of the attackers asked the victim where he was from. The victim responded he was from the Bay Area and added, "you guys are some suckas out here." The attackers then began beating the victim, while one of them "announc[ed] Killa Mob[b] gang." The beating was a means of establishing respect for Killa Mobb because if someone in the gang is disrespected and the gang does not act upon that, the gang would be perceived as weak. Thus, the gang evidence was relevant to explain motive and the violent reaction based on the victim's verbal slight. The trial court therefore acted within its discretion in denying the motion to bifurcate the gang enhancement.

II

*The Court Did Not Prejudicially Err In Its Rulings Regarding Admission Of The*
*Gang Expert's Testimony To Prove The Primary Activities Of A Gang,*
*And Counsel Were Not Deficient In Their Reactions To The Court's*
*Treatment Of This Evidence And Related Instructions*

In a number of related contentions, defendants raise issues relating to the court's admission of, the evidentiary proof of, and instructions relating to the gang enhancements. We take each in turn, keeping in mind the following definition and elements of the gang enhancement.

The gang enhancement provides as follows: "[A]ny person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal

7

conduct by gang members, shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted, be punished . . . ." (Pen. Code, § 186.22, subd. (b)(1).) Under this code section, the People must prove that a defendant committed a crime: (1) for the benefit of, at the direction of, or in association with any criminal street gang; and (2) with "the specific intent to promote, further, or assist in any criminal conduct by gang members." (Pen. Code, § 186.22, subd. (b)(1).) A " 'criminal street gang' " "means any ongoing organization, association, or group of three or more persons . . . having as one of its primary activities the commission of one or more of the [enumerated] criminal acts . . . , having a common name or common identifying sign or symbol, and whose members individually or collectively engage in or have engaged in a pattern of criminal gang activity." (Pen. Code, § 186.22, subd. (f).)

A

*Defendants Forfeited Their Request For An Limine Hearing By Failing*
*To Request One On The Subject Matter They Now Raise On Appeal*
*And By Failing To Object During The Trial Testimony Itself*

Whitfield contends the trial court erred in denying his request for an in limine hearing pursuant to Evidence Code section 402 (the procedure for determining foundational and other preliminary facts) and Evidence Code section 352 to determine whether at trial Detective Bell would rely on inadmissible and/or unduly prejudicial hearsay to support his opinion that certain offenses constituted the primary activities of Killa Mobb. Defendants Christian and Kemokai join in these contentions. As we explain below, they have forfeited this contention because, one, the trial court never denied such a request and two, defendants never objected when the testimony was proffered, as they were required to do.

One, Whitfield's request in the trial court for a section 402 hearing was to preclude Detective Bell from relying on hearsay statements to establish Killa Mobb's

8

*predicate offenses*. But on appeal, Whitfield's argument is not about the predicate offenses, but rather, about the *primary activities* of Killa Mobb, which goes to proving a different aspect of the gang enhancement. Having not raised, in the trial court, the issue he now puts forth on appeal, he has forfeited it. (Evid. Code, § 353; *People v. Clark* (1992) 3 Cal.4th 41, 127-128.)

And two, Whitfield never got a ruling on his motion, even if it could have been construed as raising an issue about precluding Detective Bell from testifying regarding hearsay in forming his expert opinion about the primary activities of Killa Mobb. Specifically, Whitfield initially raised in his trial brief the issue of precluding Detective Bell from relying on hearsay statements to prove the predicate offense part of the gang enhancement. The court deferred ruling on this motion and told Whitfield's trial counsel to raise objections during direct examination of the gang expert. During trial, Detective Bell testified that Killa Mobb's primary activities included "burglaries, robberies, shootings, [and] unlawful gun possession." Detective Bell also explained the basis for his opinion. There was no objection during this testimony. Thus, Whitfield has forfeited his contentions. (See *People v. Jennings* (1988) 46 Cal.3d 963, 975, fn. 3 [after an in limine motion, the party seeking exclusion must object at the time evidence is offered to preserve the issue for appeal].)[5]

B

*Sufficient Evidence Supported The Gang Enhancement*

Whitfield contends there was insufficient evidence of the gang enhancement, violating his federal rights to due process of law and proof beyond a reasonable doubt. Specifically, he claims there was insufficient evidence Killa Mobb was a street gang

---

[5] To the extent Whitfield claims his trial counsel was ineffective for failing to object at the time of the trial testimony, we disagree because it was not objectionable, as we explain in part IID below.

because there was insufficient proof of its primary activities. Christian joins in this contention.

Whitfield's sufficiency of evidence challenge goes to the element that Killa Mobb has "as one of its primary activities the commission of one or more of the [enumerated] criminal acts . . . ." (Pen. Code, § 186.22, subd. (f).) The enumerated criminal acts include (among other things) assault with a deadly weapon, robbery, shooting at an occupied motor vehicle, burglary, mayhem, possession of a concealed firearm, and felon in possession of a firearm. (Pen. Code, § 186.22, subds. (f), (e)(1), (e)(2), (e)(5), (e)(11), (e)(16), (e)(23), (e)(31)-(e)(33).) "[E]vidence of either past or present criminal acts listed in subdivision (e) of section 186.22 is admissible to establish the statutorily required primary activities," but is alone "[n]ot necessarily" "sufficient to prove the group's primary activities" because "[t]he phrase 'primary activities' . . . implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations." (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 323.)

Here, Detective Bell testified that in his expert opinion, the primary activities of Killa Mobb included "burglaries, robberies, shootings, [and] unlawful gun possession." Detective Bell's testimony was supported by evidence of specific criminal conduct. Certified documents introduced by the People showed that Killa Mobb member minor J. D. was charged with burglary in December 2006 and admitted to battery in January 2007, "a reasonably related offense" to the burglary. Certified documents also showed that Killa Mobb member minor C. B. admitted in November 2007 to possession of a concealable firearm by a minor.

Detective Bell's testimony was also supported by a stipulation that Lee had been convicted of "assault with a firearm" that occurred during the second half of 2008 and he admitted that crime was committed for the benefit of or in association with Killa Mobb.

10

Detective Bell's testimony was also supported by Atwaal's trial testimony that he joined Killa Mobb in the summer 2008, that in mid-October 2008, he and other Killa Mobb members were involved in a shooting at an occupied car at an am/pm market in which Killa Mobb members were the aggressors, and were also involved in the current Shell station beating during which they took the victim's possessions.

Finally, Simpson testified that he decided to get jumped out of Killa Mobb because the gang was "[a]lways fighting" and that during the four months that he was part of the gang, he was "involved in a lot of fights."

From this testimony there was sufficient evidence that from December 2006 through the time of the current attack at the Shell gas station in November 2008, the primary activities of Killa Mobb included "burglaries, robberies, shootings, [and] unlawful gun possession."

C

*The Court's Instruction On Primary Activities*

*Was Wrong But There Was No Prejudice*

Whitfield contends the trial court prejudicially erred in violation of his federal constitutional rights in instructing the jury that for purposes of the gang enhancement, the jury had to find that primary activities of Killa Mobb were "*commission of possession of a firearm*, burglary or assault with a firearm." (Italics added.) Defendants Christian and Kemokai join in this contention. The court erred, but there was no prejudice. We explain.

For purposes of the gang enhancement, only "prohibited" possession of a firearm qualifies as a primary activity. (Pen. Code, § 186.22, subds. (f), (e)(31)-(e)(33).) The instruction here was wrong because it did not specify that only prohibited possession of a firearm qualified. Nevertheless, there was no prejudice, under either the federal or state-based standards of review. (*Chapman v. California* (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] ["before a federal constitutional error can be held harmless, the court must

11

be able to declare a belief that it was harmless beyond a reasonable doubt"]; *People v. Watson* (1956) 46 Cal.2d 818, 836 [before a state error can be held harmless, the court must be able to declare that it is not "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error"].)  The only possession of a firearm as an offense brought up by the prosecutor with respect to the gang enhancement both at trial and in closing was that of C. B., namely, his illegal gun possession as a minor.  The prosecutor in closing stressed that he had introduced into evidence certified copies of the juvenile record, showing what the juvenile was "convicted of" so "[i]t's just proof beyond anybody's word, beyond any doubt because it's a certified court record."  As even Whitfield points out in his brief, C. B.'s "juvenile unlawful firearm possession adjudication was the only legitimate evidence of an enumerated firearm offense."  Thus, where the only evidence of gun possession that the People relied on at trial and stressed in closing was unlawful gun possession for which proof was a certified court record that the defense did not rebut, the error was harmless beyond a reasonable doubt.

D

*There Was No Confrontation Clause Violation*

*Because The Gang Expert Did Not Rely On Testimonial Hearsay*

Whitfield contends the gang expert violated his Sixth Amendment right to confront the witnesses against him when Detective Bell relied on testimonial hearsay to explain his opinion regarding the primary activities of Killa Mobb.[6]  Defendants

---

[6]     Recently, in *People v. Sanchez* (2016) 63 Cal.4th 665, the California Supreme Court held that "the case-specific statements related by the prosecution expert concerning defendant's gang membership constituted inadmissible hearsay under California law. They were recited by the expert, who presented them as true statements of fact, without the requisite independent proof.  Some of those hearsay statements were also testimonial and therefore should have been excluded."  (*Sanchez*, at pp. 670-671.)  Here, as we

12

Christian and Kemokai join in this contention. To the extent defendants did not raise this contention during the trial testimony of Detective Bell and they contend their attorneys were deficient, we find no deficient performance, as Detective Bell did not rely on or convey testimonial hearsay when forming or relaying his opinion. (See *Strickland v. Washington* (1984) 466 U.S. 668, 687 [80 L.Ed.2d 674, 693] [deficient performance is the first prong of an ineffective assistance of counsel claim].) We explain.

In *Crawford v. Washington* (2004) 541 U.S. 36 [158 L.Ed.2d 177], the United States Supreme Court held that "the admission of testimonial out-of-court statements violates a defendant's confrontation rights unless the witness is unavailable to testify and the defendant had a prior opportunity for cross-examination." (*People v. Valadez* (2013) 220 Cal.App.4th 16, 30.) In *Valadez*, the gang expert's opinions were based on written information from the police department regarding gangs, conversations with other gang officers, conversations with gang members, self-admissions by gang members, field interview cards, the facts of the case, and the defendants' tattoos. (*Id*. at pp. 27-29.) The appellate court assumed the general out-of-court statements on which the gang expert relied were offered for their truth, but nevertheless concluded there was no confrontation clause violation because they were not testimonial. (*Id*. at p. 32.) "[U]nder any definition of 'testimonial' the general background information [the officer] obtained from gang members, other officers, and written materials on the history of the El Sereno and Lowell Street gangs plainly does not qualify." (*Id*. at p. 35.) The information the expert received by talking with officers and gang members in consensual encounters may be useful for expert testimony, but it "does not mean his *primary purpose* in obtaining this information was to use it against appellants"; rather, "[d]ay in and day out such information would be useful to the police as part of their general community policing

explain, the gang expert did not rely on testimonial hearsay and did not convey out-of-court statements to the jury to form his expert opinion.

13

responsibilities quite separate from any use in some unspecified criminal prosecution." (*Id.* at p. 36.) In a similar vein, business records such as police rap sheets are not testimonial under *Crawford*. (*People v. Morris* (2008) 166 Cal.App.4th 363, 372-373.)

Here, as we have noted, Detective Bell testified that in his expert opinion, the primary activities of Kill Mobb included "burglaries, robberies, shootings, [and] unlawful gun possession." He based his opinion on his eight and one-half years as a police officer, two and one-half years as a gang detective, being the lead investigator in the current case, being the lead investigator on at least 30 other gang crimes and assisting on 60 other gang crime investigations, reviewing police data bases "for informational purposes to gather . . . information about Killa Mobb," being in daily contact with gang members, including at least 15 members of Killa Mobb, that included "conversations" with Killa Mobb members and associates about that gang's "culture and crimes," and viewing MySpace pages that included photographs of gang members.

Detective Bell did not convey any out-of-court statements to the jury, but rather, relied on some hearsay evidence (for example, conversations with gang members and/or other police offers) as well as his training and expertise to form his expert opinion. This does not violate the confrontation clause. (See *United States v. Kamahele* (10th Cir. 2014) 748 F.3d 984, 1000 ["Introduction of opinion testimony does not violate the Confrontation Clause when the experts rely on their independent judgment -- even when this independent judgment is based on inadmissible evidence . . . , [b]ut if the expert is simply 'parrot[ing] "out-of-court testimonial statements of cooperating witnesses and confidential informants directly to the jury in the guise of expert opinion," ' the testimony would be inadmissible"]; *United States v. Johnson* (4th Cir. 2009) 587 F.3d 625, 635 [where "the expert is, in essence, giving an independent judgment," "applying his training and experience to the sources before him and reaching an independent judgment," and not "merely acting as a transmitter for testimonial hearsay," "there will typically be no *Crawford* problem"].) Nor did his viewing and testimony of the

14

photographs on MySpace implicate confrontation clause concerns. MySpace pages are not testimonial, lack all indicia of formality, and a person making statements on MySpace would not have believed they were participating in the presenting of evidence for a criminal trial.

In sum, there were no out-of-court testimonial statements relied upon or parroted by Detective Bell in reaching his independent judgment about what he considered were the primary activities of Killa Mobb. As such, there was no confrontation clause violation.

*E*

*The Trial Court Had No Sua Sponte Duty To Instruct That Any Hearsay Evidence*
*Repeated By The Gang Expert Could Not Be Used For The Truth Of The Matter;*
*Trial Counsel Was Not Deficient For Failing To Request This Instruction*

Whitfield contends (with Christian and Kemokai joining) the trial court erred in failing to give sua sponte CALCRIM No. 360, which reads as follows: "[Detective Bell] testified that in reaching (his/her) conclusions as an expert witness, (he/she) considered [a] statement[s] made by [_____]. [I am referring only to the statement[s]] [insert or describe statements admitted for this limited purpose]. You may consider [that/those] statement[s] only to evaluate the expert's opinion. Do not consider (that/those) statements as proof that the information contained in the statement[s] is true."

There is no sua sponte duty to give instructions limiting the purpose for which a jury can consider evidence. (Evid. Code, § 355.) "When evidence is admissible . . . for one purpose and is inadmissible . . . for another purpose, the court upon request shall restrict the evidence to its proper scope and instruct the jury accordingly." (*Ibid.*; see also *People v. Macias* (1997) 16 Cal.4th 739, 746, fn. 3 ["absent a request by defendant, the trial court has no sua sponte duty to give a limiting instruction].) Here, no counsel asked for this instruction, so there was no duty for the court to give it.

15

Whitfield's backup contention (in which Christian and Kemokai join as well) is that his trial counsel was ineffective for not requesting CALCRIM No. 360. Trial counsel was not deficient because he could have had a tactical reason for not requesting the instruction. (*People v. Wright* (1990) 52 Cal.3d 367, 412 [reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel].) He may not have wanted to draw attention to any hearsay evidence on which Detective Bell relied. This is so because then the jury could have had reason to focus its attention on the certified documents that proved (without an evaluation of credibility) existence of at least one offense committed by a Killa Mobb member that was evidence of the primary activities (especially more so than hearsay that provided part of the basis for the detective's expert opinion) or on other nonhearsay evidence from others such as Atwaal that he and other Killa Mobb members were involved in the am/pm shooting at an occupied car and in the current crimes.

III

*The Trial Court Acted Within Its Discretion In Excluding*

*Photographic Evidence Of Atwaal's Socio-Economic Status*

Whitfield contends the trial court abused its discretion in excluding from evidence photographs depicting Atwaal's neighborhood and the front door of his house (which showed that he lived in a nice, suburban neighborhood) because it was relevant evidence "to corroborate the theory that Killa Mobb was a party clique rather than a territorial, criminal enterprise." Christian and Kemokai join in this contention. The court excluded this evidence because "the photographs are not particularly relevant," they are "redundan[t]," and raise a "security concern."

The trial court acted well within its discretion in excluding these photographs from evidence. (*People v. Waidla* (2000) 22 Cal.4th 690, 717 [standard of review].) Evidence that Atwaal lived in a nice neighborhood was not relevant because Whitfield cites no binding or persuasive authority that an individual's higher socio-economic status

16

indicates a lower likelihood of being in a criminal street gang.[7]  In other words, we do not accept the logic that Killa Mobb would be less likely to be a criminal street gang as opposed to a party clique simply because one of its members lived in a nice house, in a nice neighborhood.  For this reason, the court was correct that "the photographs are not particularly relevant."  The court was also correct that the pictures were "redundan[t]" because Atwaal had already testified he lived in "a nice suburban neighborhood" and not in "public housing."  Finally, the court was also correct that the pictures raised a "security concern."  One of the pictures showed "an entire overview of [the] neighborhood [with] street names" and another showed "detail[s] about things that are in front of [Atwaal's] house."  Atwaal was a cooperating witness who had been granted use immunity for testifying here, and another cooperating witness had already received threats from an unknown source.  Thus, the court acted within its discretion to exclude these photographs.

IV

*The Trial Court Acted Within Its Discretion To Admit*

*Evidence Of Bullets Found In Whitfield's Sofa*

Whitfield contends the trial court abused its discretion to admit evidence that police found nine .380-caliber live ammunition rounds hidden in his sofa that included four rounds of the CCI brand because this evidence was only marginally relevant while at the same time overly prejudicial.  Christian and Kemokai join in this contention.  We disagree.

Relevant evidence is broadly defined as that having a tendency in reason to prove or disprove any disputed fact that is of consequence to resolving the case.  (Evid. Code,

---

[7]  The authority Whitfield cites as he terms it is "scholarly work" from a law journal article that states "the economic and social marginalization of low income and minority communities is the major factor that leads many juveniles to join gangs."

17

§ 210.)   The ammunition evidence was relevant because it tended to prove Whitfield was part of the attack, knew about Lee's gun, and was involved with actually hiding something connected to that gun -- its ammunition.  Lee and Whitfield were in the circle of people attacking the victim, and Lee was using a gun to beat the victim.  A .380-caliber gun was being used by one of the perpetrators.  Eleven days after the beating, police found Lee driving a car and Lee correctly told police that they would find his .380-caliber gun in the pouch behind the front passenger seat.  The gun was loaded and included one CCI brand round.  Police then went to Whitfield's house to do a search because police overheard Whitfield telling another suspect in a police interview room that they had hidden something in Whitfield's couch.  That something turned out to be nine .380-caliber live ammunition rounds, including four rounds of the CCI brand.

Against this backdrop of relevance, evidence of ammunition in a sofa was not likely to provoke an emotional response with the jury, as Whitfield claims.  Where there was evidence that Lee possessed a loaded gun, was driving around with it, and thus, it was likely he was beating the victim with a loaded gun earlier, evidence that Whitfield was aware of ammunition hidden in the sofa would not be unduly prejudicial.  Thus, the trial court did not abuse its discretion in allowing in this evidence.  (See *People v. Nguyen* (2013) 212 Cal.App.4th 1311, 1333 [where a trial court had admitted evidence of a defendant's rifle possession, it was not an abuse of discretion to also admit evidence he possessed another rifle and ammunition].)

V

*The Trial Court Correctly Instructed The Jury*

*Regarding When An Assault Begins*

Whitfield contends the "trial court erred by failing to instruct that the charged assault could not have begun with co-defendant Christian brandishing his firearm at the green Taurus but could only have begun when he was in position to immediately strike [the] victim."  (Bolding and capitalization omitted.)  Whitfield argues the court's

18

instructions on this point "were incomplete and prejudicially misleading," violating his rights to due process of law and proof beyond a reasonable doubt.

During deliberations, the jury asked the court, "We would like clarification of when the crime of assault with a fire[]arm began. Did it begin when the car was chased away with a gun or when the physical attack actually beg[a]n?" The court responded, "You are the triers of fact in this matter. The timing of when the commission of a crime begins and when it ends, if relevant, is for you to decide based upon the evidence produced during the trial."

The court's instruction was proper. It was for the jury, not the court, to be the finder of fact and thus determine the beginning and ending of a crime. (Pen. Code, §§ 1126 ["[i]n a trial for any offense, . . . questions of fact [are to be decided] by the jury"], 1127 ["[t]he court shall inform the jury in all cases that the jurors are the exclusive judges of all questions of fact submitted to them"].)

In a related subargument, Whitfield contends, "the court[] erred by failing to define generic assault" (bolding and capitalization omitted) because the offense of assault by the principal (Christian) did not begin "(or begin to occur for aiding and abetting purposes) until the principal had the present ability to immediately strike the victim." Specifically, Whitfield claims the court should have responded to the jury's question by providing a definition of simple assault and explaining that assault requires an immediate ability to strike. The court, however, had already so instructed the jury in its standard instructions on aiding and abetting principles (CALCRIM Nos. 400, 401) and on simple assault (CALCRIM No. 915). These instructions told the jury that the crime of assault requires that "when the defendant acted he had the present ability to apply force to a person." There was no need for the court to repeat these instructions. (See *People v. Hamilton* (1989) 48 Cal.3d 1142, 1180 [when a court has given correct and adequate instructions on the point, the court has no sua sponte duty to repeat those instructions].)

19

## VI

### *Sufficient Evidence Supported The Attempted Murder*
### *Convictions Of Christian And Kemokai*

Christian and Kemokai contend insufficient evidence supported their convictions for attempted murder because there was no evidence they intended to kill the victim. Not so.

The victim testified Christian instigated the beating by hitting him on the head, rendering him temporarily unconscious. In addition, the part of the group beating captured on video showed Christian and Kemokai actively involved in beating the victim in vulnerable places on his body when he was on the ground and defenseless. Specifically, Christian lifted his arm over his head and swung downward toward the victim. The victim tried to roll away from the attack, but Christian and Kemokai pursued him. Christian kicked the victim in the head. Kemokai hit the victim in the upper body/head area with two overhead, heavy blows. Christian pistol-whipped the victim in the head after he had been searched for his possessions. After Christian fled, Kemokai pulled out a firearm, raised it over his head, and hit the victim's head. As a result of all this trauma, the victim had multiple lacerations to his head and face, a fracture to the upper jaw, and was at risk of a concussion and serious neck injury.

Christian's and Kemokai's repeated kicks, blows, and pistol whips to the victim's head, a vulnerable spot for death, at a time when he was defenseless were more than sufficient to demonstrate they intended to kill the victim. (*People v. Lasko* (2000) 23 Cal.4th 101, 112 ["the evidence strongly suggested an intent to kill" where the defendant hit the victim multiple times on the head with extreme force, causing extensive and multiple fractures to the head area].)

## VII

*The Jury Could Use Simpson's Testimony To Corroborate*

*Atwaal's Testimony, As Simpson Was Not An Accomplice*

Cornelius and Christian contend there was insufficient evidence to corroborate the accomplice testimony of Atwaal. The premise of their contention rests on their argument that Simpson, too, was an accomplice, so his testimony could not be used as corroboration. We disagree that Simpson was an accomplice (although he may have been an accessory after the fact). And because he was not an accomplice, his testimony could be used to corroborate Atwaal's testimony. We explain.

"A conviction cannot be had upon the testimony of an accomplice unless it be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense . . . . An accomplice is hereby defined as one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (Pen. Code, § 1111.) "[O]ne accomplice may not corroborate another." (*People v. Boyce* (1980) 110 Cal.App.3d 726, 737.)

Here, the jury was instructed that "[i]f the crimes of attempted murder, assault with a firearm, robbery, or mayhem were committed, then . . . Atwaal was an accomplice to those crimes," and it could not convict defendants of those crimes "based on the testimony of an accomplice alone." The instructions did not state Simpson was an accomplice. Consistent with the instructions, the prosecutor argued in closing that Simpson was not an accomplice because he could not be prosecuted for the charged crimes, and the most he could be prosecuted for was being an accessory after the fact for picking up Christian's hat.

The court's instructions and the prosecutor were correct -- Simpson was not an accomplice. When questioned at trial, Simpson admitted only to picking up the hat. He denied hitting anybody, kicking anybody, or having a gun. Defense counsel asked him if

21

at the beginning of the fight he "jumped on the [victim], hit him once or twice, and got his blood flowing." When Simpson denied all of this, defense counsel followed up with asking him whether he told Detective Bell during an interview that he had jumped on the victim. Simpson responded, "no." When the prosecutor asked defense counsel for a "[p]age reference," defense counsel stated, "Judge, I will hold off on this. I need to see the transcript." There was no subsequent testimony that during the attack on the victim, Simpson did anything other than pick up the hat after the fact, which as the prosecutor argued, would have made him criminally liable only for being an accessory after the fact. (See *People v. Daniels* (1991) 52 Cal.3d 815, 867 [where the witness was present at the crime and aided a defendant in the escape, he was at most an accessory after the fact and no cautionary instruction was necessary that this witness's testimony needed corroboration].) Consistent with all of this, Simpson himself testified he was told by the prosecution that he could be charged with being an accessory after the fact, facing three years in prison, for picking up Christian's hat and then he agreed to testify truthfully here in exchange for "use immunity."

Cornelius argues that Simpson was criminally liable for the charged crimes, however, because he was at the gas station to act as a lookout or provide backup. However, there was no evidence Simpson was a lookout or provided backup. Other than picking up Christian's hat, he was not involved in the attack. Given his lack of involvement, Simpson could not have been an accomplice, so the jury could use his testimony to corroborate Atwaal's.

VIII

*Kemokai's Trial Counsel Was Not Deficient For Failing To Object To*

*Photos Showing Others Making Gang-Related Hand Signs*

Kemokai contends his trial counsel was ineffective for failing to object to what he claims were unauthenticated photographs introduced into evidence during the testimony of Detective Bell showing people other than Kemokai making gang-related hand signs.

Kemokai cannot prove his counsel was ineffective because counsel could have had a tactical reason not to object:  Kemokai was not identified as being in any of these pictures.  Counsel may have reasonably concluded that the pictures helped Kemokai's defense because the jury could have believed that Kemokai's absence from all of these pictures meant he was not actually a member or associate of Killa Mobb.

IX

*There Was No Cumulative Prejudice*

Defendants contend that the errors they have alleged must be evaluated for their cumulative prejudicial effect and that together those errors violated their due process right to a fair trial.  We have found only one error (the instruction defining possession of a firearm as a primary activity of Killa Mobb) that was harmless, so there are no multiple errors to accumulate.

X

*The Trial Court Did Not Err In Denying Defendants*

*A New Trial Based On Juror Misconduct*

Defendants Whitfield and Cornelius contend the trial court erred in denying them a new trial based on prejudicial juror misconduct.  Christian and Kemokai join in this contention.

We take each of the seven misconduct allegations in turn, keeping in mind the following standards:

"When a party seeks a new trial based on juror misconduct, the trial court must determine from admissible evidence whether misconduct occurred and, if it did, whether the misconduct was prejudicial.  [Citation.]  Prejudice is presumed where there is misconduct.  This presumption can be rebutted by a showing no prejudice actually occurred or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party."  (*People v. Loot* (1998) 63 Cal.App.4th 694, 697.)  "The moving party bears the burden of

23

establishing juror misconduct." (*Donovan v. Poway Unified School Dist.* (2008) 167 Cal.App.4th 567, 625.)

"We review independently the trial court's denial of a new trial motion based on alleged juror misconduct.  [Citation.]  However, we will ' "accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." ' " (*People v. Gamache* (2010) 48 Cal.4th 347, 396.)

A

*Juror No. 1's Failure To Disclose That*

*His Brother-In-Law Was Killed By A Drunk Driver*

Whitfield contends that Juror No. 1 committed prejudicial misconduct by "willfully conceal[ing]" that his brother-in-law was killed by a drunk driver.  The trial court found misconduct but was "not willing to jump to the conclusion that it was intentional concealment designed to mislead."  As our court has noted, "[i]n evaluating claims of intentional concealment by jurors during voir dire, '[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence.'  [Citations.]  With these principles in mind, we consider defendants' claims of misconduct by Juror No. [1]." (*People v. Tuggles* (2009) 179 Cal.App.4th 339, 371-372.)

Here, there was substantial evidence that Juror No. 1 did not intentionally conceal this information.  The at-issue voir dire question to which Juror No. 1 answered "No" in April 2010 was the following:  "Have you, a close friend or relative ever been a victim of a crime?  If yes, state the nature of the crime(s)."  On Juror No. 1's Facebook page, there was a post in May 2010 stating the following:  "It's been said that the first year following the sudden death of a loved one is the most difficult, THAT'S WHY MY PAGE IS DEDICATED TO MY SISTER ALICIA IN HONOR OF MOTHERS/FATHERS DAY, my sister lost her husband by a selfish act [of] a DRUNK DRIVER rip Arnold . . . Alicia you and you[]r[] five girls are SURVIVORS . . . THANK YOU GOD for giving them the

24

strength…"  In June 2012, Juror No. 1 posted, "me and Arnold good times . . . in my . . . heart forever . . . rip."

These posts do not indicate the drunk driver who killed Juror No. 1's brother-in-law was ever charged with a crime.  Thus, Juror No. 1 may have simply categorized this incident as a traffic fatality or traffic accident instead of a criminal act.  Thus, we agree with the trial court there was no evidence that his failure to disclose the killing of his brother-in-law by a drunk driver was an intentional concealment designed to mislead.

B

*Juror No. 1's Postings On Facebook About This Trial*

During trial, the court instructed jurors, "do not talk about the case . . . with anyone . . . .  Do not share information about the case in writing, by e-mail or on the Internet."

During trial, Juror No. 1 stated on Facebook that he was on jury duty with postings such as the following:  "Jury duty week three and we still don't have all the panel selected"; "After all the stupid excuses and people saying they hate police and black people to get off jury duty hmmmm. . . .  Maybe [I] should have c[o]me up with a lame excuse also"; "my case was suppose[d] to last six weeks and we[']re on week three now and no end in sight[,] this sucks"; "[l]ooks like a two week stay for me @ jury duty . . ."; "Fourth week of jury duty and six weeks to go LUCKY ME . . ."; "getting ready for jury duty"; "Week 5 of jury duty"; "Jury duty week six . . ."; and "Back to jury duty can it get any more BORING than going over metro pcs phone records . . . uuuggghhhhhh."

At a hearing about these Facebook entries, Juror No. 1 testified that when he made these posts, he did not think "at the time" he was violating the court's admonition because he did not think he was talking about the case.  He "really didn't read the comments" that people wrote in response to his posts.  The court found that Juror No. 1 was "credible" and that he was "doing [his] best to be open and honest . . . ."  The court

25

nevertheless found misconduct, but also found no "actual bias" on the part of Juror No. 1 and no "inherent[] prejudice[] as a result of that misconduct."

"[T]he misconduct of discussing the case with nonjurors while the case is pending" "raises the presumption of prejudice," but "[t]his presumption of prejudice ' "may be rebutted by an affirmative evidentiary showing that prejudice does not exist or by a reviewing court's examination of the entire record to determine whether there is a reasonable probability of actual harm to the complaining party [resulting from the misconduct]. . . ." ' " (*In re Hitchings* (1993) 6 Cal.4th 97, 119.)

We agree with the trial court there was no prejudice on our de novo review. Most of these postings were simply statements that Juror No. 1 was still on jury duty and revealed nothing about the evidence or his thoughts on the case. One that was not (expressing his boredom with the testimony about the phone records) actually cut against the prosecution, who was the party who presented those records.

Defendants claim that the other ones that went beyond simply stating he was on jury duty "demonstrate[d] mockery and even contempt for the judicial process." These included "Maybe [I] should have c[o]me up with a lame excuse also" to get out of jury duty, "no end in sight[,] this sucks," and "six weeks to go LUCKY ME . . . ." Fairly understood, these comments expressed frustration at the length of the case. There was no evidence Juror No. 1 took out this frustration on defendants. Instead, quite the opposite. The jury acquitted four defendants (three appellants and one codefendant) of various charges, demonstrating there was no reasonable probability of actual harm based on his Facebook postings.

## C

*Juror No. 1 Discussing On Facebook Where The Trial Was Being Held And*

*"Arranging" For An Acquaintance To View The Trial*

Whitfield contends that Juror No. 1 "may have misled the Court" by arranging a court visit for a nonjuror to watch the trial and then agreeing to lie about knowing the nonjuror when she came to court.

The facts behind the planned visit were these. On May 28, 2010, a female acquaintance of Juror No. 1 initiated a Facebook conversation with him and asked him the "address" of the trial and asked how long he had been on the case. Juror No. 1 responded "six weeks . . . the address is 720 9th street . . . Court house is closed until Tuesday" and later added it was department 31 on level 4. The female acquaintance responded, "Thank you. Can you talk about the case?" Juror No. 1 replied, "sorry [I] can't talk about the case . . . btw if u come to the courtroom [I] have [to] act like [I] don't know you. . . ." The female acquaintance responded, "That's what I thought, I was making sure :) Okay THANK YOU for the info! And don't worry about it, I understand!"

The trial court found that Juror No. 1 had not misled the court, and that finding was supported by substantial evidence. (See *People v. Gamache*, *supra*, 48 Cal.4th at p. 396 [standard of review].) Juror No. 1 told the acquaintance only where the trial was and then correctly informed her that he could not talk about the case. In regard to Juror No. 1 having to act like he did not know her, Whitfield contends he "agreed to lie and, if queried, to denying knowing [her]." There is no evidence this acquaintance ever came to court and had any interaction with Juror No. 1.

To the extent Whitfield points to the following testimony from Juror No. 1 that the court solicited out of the presence of the jury and audience members on May 18, 2010, about somebody Juror No. 1 knew in the audience, that audience member was male, so it could not have been the same person as the Facebook acquaintance. In any event, the

evidence about the male acquaintance provides additional support for the court's credibility determination about Juror No. 1. As to the male acquaintance who showed up on May 18 and "approached [Juror No. 1]," the court found the situation "truly innocuous." Juror No. 1 testified this was somebody with whom he worked previously, he did not know that his former coworker was in the audience until his former coworker approached him, this was the first time he had seen his former coworker in three or four years, he was not going to hold anything against anybody in this case, and that he would be able to listen to the evidence here and decide the case just on that evidence.

D

<em>Juror No. 1 Discussing Postverdict Hearing Testimony</em>

Whitfield contends that Juror No. 1 committed misconduct by violating the trial court's admonition not to discuss any postverdict hearing testimony. We disagree.

During the postverdict hearing on juror misconduct, jurors were separately questioned, and Juror No. 1 was "admonish[ed] . . . not to discuss anything about our conversation with anyone." Whitfield contends Juror No. 1 defied this admonition.

The fatal problem for Whitfield's contention is it is based on inadmissible hearsay statements made to the trial court by Christian's trial counsel. Specifically, Christian's trial counsel told the court that Juror No. 5 had called someone in his office and told that person Juror No. 1 had followed Juror No. 5 to her car, and "continually asked [Juror No. 5] what was going on and what kind of questions she received here in Court. [Juror No. 5] felt uncomfortable and told [Juror No. 1] that, The Judge specifically said we can't talk about this, and his response was that, It's okay, [i]t's all over, you can talk about it." These "[u]nsworn statements cannot be used to establish juror misconduct." (*People v. Vallejo* (2013) 214 Cal.App.4th 1033, 1043.)

28

E

*Receipt Of Outside Information Regarding Killa Mobb By Juror No. 1*

Whitfield and Cornelius contend that Juror No. 1 committed misconduct by concealing receipt of outside information regarding Killa Mobb. This contention is based on a declaration signed by Juror No. 5 dated August 10, 2010. In it, Juror No. 5 stated as follows: "after the jury verdict was delivered, the foreman, juror number 1, stated that a co-worker had explained to him after the trial that he knew 'Killa Mobb' from high school and that they were a gang and that the guys in this case were bad guys."

The fatal problem with this contention is that defendants speculate that Juror No. 1 received this information about Killa Mobb before or during trial. However, Juror No. 5's declaration states that the information about Killa Mobb was relayed to Juror No. 1 "after the trial." A reasonable interpretation of the phrase "after the trial" is postverdict. With this interpretation, there was no misconduct because Juror No. 1's receipt of this information postverdict "does not show bias during the trial, deliberations, and verdict." (*In re Carpenter* (1995) 9 Cal.4th 634, 657.) As defendants acknowledge, the trial court did not explore this topic (Juror No. 1's receipt of information about Killa Mobb) in the postverdict juror voir dire. "[T]he initial burden is on defendant to prove the misconduct. [Citation.] We will not presume greater misconduct than the evidence shows." (*In re Carpenter*, at p. 657.) Here, defendants have not shown any misconduct because they have not established that Juror No. 1 received outside information about Killa Mobb at any time other than postverdict.

F

*Allegation That Juror No. 8 Concealed Her Inability*

*To Abide By The Standard Of Proof Beyond A Reasonable Doubt*

Whitfield and Cornelius contend Juror No. 8 committed misconduct because she was unable to follow the court's instruction requiring the People prove defendants' guilt beyond a reasonable doubt and that she concealed her inability to follow that instruction.

29

Defendants have not carried their initial burden to prove misconduct because their argument is not supported by the facts, and the trial court specifically found Juror No. 8 credible. (*In re Carpenter*, *supra*, 9 Cal.4th at p. 657.) We explain below.

Juror No. 5 testified at a postverdict hearing that Juror No. 8 made a comment at some point "towards the beginning or the middle of the trial" that her son had been a juror in a DUI trial and those jurors had found the defendant guilty "because there was no defense. Of course they had to find him guilty." This comment made Juror No. 5 "uneasy."

Juror No. 8 then testified the comment she made was that the defendant in her son's case did not have a defense. This had nothing to do with the current case. She "didn't care if [the current defendants] testified or not. That was their right." The court found Juror No. 8 "credible" and it "did not get an impression . . . that there was an effort to hide anything."

On our independent review, we find no misconduct, given the testimony of Juror No. 8 that the court credited. (See *People v. Gamache*, *supra*, 48 Cal.4th at p. 396 [standard of review].) Juror No. 8's comment about her son's jury service had only to do with that case, had no impact on her reasoning in this case, and she did not care whether defendants here testified because that was their right.

G

*Juror No. 1 And Juror No. 8 Conferring*

*Regarding The Postverdict Hearing On Juror Misconduct*

Whitfield and Cornelius contend Jurors Nos. 1 and 8 committed misconduct by conferring with one another after being notified about the postverdict hearing but before they testified at that hearing.

The evidence was that before the postverdict hearing, Juror No. 8 emailed Juror No. 1 and told him she (Juror No. 8) had received a call from the court to come to

30

the postverdict hearing and was wondering if Juror No. 1 had received the same call. Juror No. 1 responded that he also got the call and was coming in. Juror No. 8 then emailed Juror No. 1 that she had looked online that "they were requesting a retrial, but [she] didn't know why."

The fatal problem with defendants' misconduct contention based on this testimony is that there is no evidence either juror violated a court order or instruction that told them not to communicate with the other jurors before the postverdict hearing.[8] Thus, there is no basis on which to find misconduct from this communication between the two jurors.

XI

*The 10-Year Gun Use Enhancement For Defendant Cornelius Must Be Stricken*

Cornelius contends that his 10-year consecutive prison term for personal use of a firearm must be stricken because he did not personally use a firearm. We agree. Under Penal Code section 12022.53, subdivision (e)(1) and (e)(2), a defendant's use of a firearm in the commission of a specified felony results in an additional 10-year prison term if "the person personally used or personally discharged a firearm in the commission of the offense." As even the People agree, there was no evidence Cornelius personally used or discharged a firearm in the assault of the victim, so the enhancement must be stricken.

DISPOSITION

As to defendant Cornelius only, the 10-year enhancement for personal use of a firearm (Pen. Code, § 12022.53) is stricken. The trial court is directed to prepare an amended abstract of judgment and transmit a copy of that amended abstract to the Department of Corrections and Rehabilitation. As modified, his judgment is affirmed.

---

[8] There is also no evidence Juror No. 8 lied to the court about the nature or contents of the communication, as the trial court found Juror No. 8's testimony credible.

As to defendants Christian, Kemokai, and Whitfield, their judgments are affirmed.


/s/_____
Robie, J.


We concur:


/s/_____
Hull, Acting P. J.


/s/_____
Butz, J.